IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JACKI EASLICK, LLC, *et al*,

                *Plaintiffs*,

v.

CJ EMERALD, *et al*,

                *Defendants*.

Civil Action No. 2:23-cv-2000

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

       Plaintiffs, Jacki Easlick, LLC ("Easlick") and JE Corporate LLC ("JE"), ask the Court to enter a preliminary injunction enjoining Defendant AccEncyc US ("AE") from its unauthorized "promoting, advertising, distributing, offering for sale, and selling" of Plaintiffs' patented TOTE HANGER® brand handbag hanger hook ("Tote Hanger") associated with U.S. Patent No. D 695,526 S ("Design Patent"). (ECF No. 2, pp. 2, 5, 25). Plaintiffs assert that AE infringed on the Design Patent through offering knock-off versions ("Accused Product") of the Tote Hanger on online marketplaces. (*Id.* at p. 2–3). For the reasons explained below, the Court holds that Plaintiffs have not met their burden in demonstrating that they are entitled to preliminary injunctive relief as to AE.

## I.    STANDARD OF REVIEW

       The Patent Act provides, "[w]hoever invents any new, original and ornamental design for an article of manufacture may obtain a [design] patent" pursuant to the Patent Act. 35 U.S.C. § 171(a). At the same time, the Patent Act enables federal courts to issue injunctive relief "to prevent the violation of any right secured by patent." 35 U.S.C. § 283. For design patent

infringement claims, courts apply the preliminary injunction standards set forth by the United

States Supreme Court and the United States Court of Appeals for the Federal Circuit.  28 U.S.C.

§ 1295(a)(1) ("The [Federal Circuit] shall have exclusive jurisdiction … of an appeal from a

final decision of a district court of the United States … in any civil action arising under … any

Act of Congress relating to patents.").

     "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*

*v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).  Rather, such relief "should be granted only in limited

circumstances."  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation

omitted).  A moving party "must establish entitlement to relief by clear evidence."  *Doe v.*

*Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018).  Specifically, the movant must

demonstrate:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm
> if the injunction is denied; (3) that granting preliminary relief will not result in
> even greater harm to the nonmoving party; and (4) that the public interest
> favors such relief.

*Kos Pharms.*, 369 F.3d at 708; *see also Winter*, 555 U.S. at 20.  The first two factors are "the

most critical," and the moving party bears the burden of making the requisite showings.  *Reilly*,

858 F.3d at 176, 179 (citations omitted).  Once those "gateway factors" are met, a court should

"consider[] the remaining two factors" and then "determine[] in its sound discretion if all four

factors, taken together, balance in favor of granting the requested preliminary relief."  *Id.* at 179.

     In reaching its decision on a request for injunctive relief, a district court sits as both the

trier of fact and the arbiter of legal disputes.  A court must, therefore, make "findings of fact and

conclusions of law upon the granting or refusing of a preliminary injunction."  *Bradley v.*

*Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) (citing Fed. R. Civ. P. 52(a)(2)).

This "mandatory" requirement of Federal Rule of Civil Procedure Rule 52(a)(2) must be met

"even when there has been no evidentiary hearing on the motion." *Id.* Nevertheless, at the preliminary injunction stage, "procedures [] are less formal and evidence [] is less complete than in a trial on the merits." *Kos Pharms.*, 369 F.3d at 718; *see also AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) ("[T]he grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing [that] is the responsibility of the district judge." (citations omitted)). Accordingly, a court "may rely on affidavits and hearsay materials which would not be admissible evidence." *Kos Pharms.*, 369 F.3d at 718 (quoting in parenthetical *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). But the weight given to such materials will "vary greatly depending on the facts and circumstances of a given case." *Id.* at 719. A court is also tasked with assessing the credibility of witness testimony and may base the decision to grant or deny a preliminary injunction on credibility determinations. *See, e.g.*, *Hudson Glob. Res. Holdings, Inc. v. Hill*, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007).

Against this backdrop, a district court maintains the sound discretion to grant or deny a preliminary injunction. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 178–79 (3d Cir. 2017) ("District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.'" (citation omitted)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). The "status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm*, 369 F.3d at 708.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs invented and now sell the Tote Hanger for consumers to hang and organize their handbags on closet rods. (ECF No. 2, pp. 2–3). Plaintiffs also secured protection for the

Tote Hanger via the Design Patent, which, in turn, claims an "ornamental design for a handbag hanger hook." (ECF No. 2-6, p. 2).

Like Plaintiffs, AE sells hanger hooks for handbags, *i.e,* the Accused Product. (ECF No. 48, p. 3). AE submits that they have sold less than $500 worth of the Accused Product to date. (*Id.* at 4). According to the Complaint, AE is an individual or business entity that duplicates products in foreign jurisdictions and redistributes them under aliases to consumers in the U.S. e-commerce market through online marketplaces Alibaba, AliExpress, Amazon, eBay, Joybuy, Temu, Walmart, and Wish. (ECF No. 2, p. 12). Plaintiffs allege AE fraudulently provided false and/or misleading information to these e-commerce platforms for the creation and maintenance of its online marketplace storefronts and associated seller identification number ("Seller ID") to engage in their alleged infringing activities. (ECF No. 2, p. 13). Plaintiffs further allege that AE uses these Seller IDs to directly engage in unfair competition with Plaintiffs and other authorized sellers by marketing and selling knock-off versions of the Tote Hanger that infringe on the Design Patent. (ECF No. 2, pp. 11–13).

On November 20, 2023, Plaintiffs filed this lawsuit against multiple defendants, including AE, for design patent infringement. (ECF No. 2). In their Complaint and *ex parte* motion, Plaintiffs requested (1) a temporary restraining order; (2) an order restraining assets and merchant storefronts; (3) an order to show cause why a preliminary injunction should not issue; and (4) an order authorizing expedited discovery against AE for infringing their Design Patent. (ECF Nos. 2, 4). On the same day, the Court held a telephonic motion hearing and granted Plaintiffs' motion for an *ex parte* temporary restraining order. (ECF Nos. 17, 22).

On December 18, 2023, Plaintiffs moved for a preliminary injunction that would bar AE from selling the Accused Product during the pendency of this litigation. (ECF No. 46). The next

4

day, the Court heard oral argument on Plaintiffs' request for a preliminary injunction where counsel for AE and Plaintiffs argued whether the Court should impose a preliminary injunction for the alleged design-patent infringement and pre-judgment asset restraint.[1]   (ECF No. 65).

### III.   ANALYSIS

### A.   Plaintiffs' Design Patent Infringement Claim

Plaintiffs have moved for a preliminary injunction on their patent infringement claim alleging that AE infringed upon the Design Patent through "promoting, advertising, distributing, offering for sale, and selling" the Accused Product.   (ECF No. 6, p. 13).   The Court must begin its analysis by evaluating the first two preliminary injunction factors, likelihood of success on the merits and irreparable harm.

#### 1.   Reasonable Likelihood of Success On the Merits

To establish a likelihood of success on the merits, a patentee must show that (1) it is "more likely than not" that the product at issue infringes its patent and (2) its infringement claim will withstand the accused's challenges to the validity and enforceability of its patent.   *See Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)   If the accused "raises a substantial question concerning either infringement or validity, *i.e.*, asserts an infringement or invalidity defense that the patentee cannot prove lacks substantial merit, the preliminary

---

[1] Counsel for the Maybeller Defendants (ABEL TANG, ATRISS, BESTOYARD, BONNIE CHILD, COLORED FLAG, ENTERTAINMENT FIRST, FACING THE OCEAN, FEPERIG, FULL OF STARS.MIN, GARDEISH, HEMPHILL HEN, HERLLOY, JAGOGH YSON, JONERCEY, KARIN YANG, LIMICOUNTS, LIPU HOOKER, LMPOSING, M.METEORITE, MAYBELLER, NISHUNA, PATRICK YAO, PBFZ, QIKITA, ROBITENO, SHANNON WENHA, SI PEIHONG, SINUOXIANG, SOMIROW, SURMOUNTY, THINKCREATORS, THOMAS ZACK YANG, TRACY ZHONG, TRAVELNA, VITONG, ZARA LEI, ZHONG ROY) appeared at oral argument.   Plaintiffs and the Maybeller Defendants entered into a consent order for a preliminary injunction on December 22, 2023.   (ECF No. 56).

injunction should not issue." *Amazon.com, Inc.*, 239 F.3d at 1350 (internal quotation marks and citation omitted).

AE does not challenge the validity of the Design Patent, only its infringement claim. (ECF No. 48, pp. 1–3).  Where an alleged infringer does not challenge a design patent's validity, "the existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue." *Am. Beverage Corp. v. Diageo North America, Inc.*, 936 F. Supp. 2d 555, 586 (W.D. Pa. 2013) (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001).  The issue in this case thus turns on whether it is more likely than not that AE's product infringes on the Design Patent.

"[A] design patent, unlike a utility patent, limits protection to the ornamental design of the article." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010).  A two-step analysis is used to determine whether a design patent has been infringed.  The first step is to properly construe the claim to determine its meaning and scope. *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995).  The second step is to compare the construed claim to the accused design to see if an infringement exists. *Id.*  In light of the evidence submitted, the Court finds that Plaintiffs have not demonstrated it is "more likely than not" that the product at issue infringes upon the Design Patent.

a. *Claim Construction*

Typically, design patent claims are better represented by illustrations than by descriptions, "[g]iven the recognized difficulties entailed in trying to describe a design in words." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008).  For example, written claim constructions "risk [] placing undue emphasis on particular features of the design and … that a finder of fact will focus on each individual described feature in the

verbal description rather than on the design as a whole." *Id.* Considering those known challenges, the Federal Circuit prefers district courts avoid attempting "to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Id.* at 680. Nonetheless, claim construction can be helpful to a fact finder in determining a claim's scope. *Sport Dimension, Inc. v. Coleman Co., Inc.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016).

"[A] design may contain both functional and ornamental elements, even though the scope of a design patent claim "must be limited to the ornamental aspects of the design.'" *Id.* (quoting *Ethicon Endo-Surgery v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015)). "Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *OddzOn Prods, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). Features are deemed functional if they are "'essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.10 (1982)).

"The relevant inquiry when determining functionality is 'whether the function performed by the features in question could be accomplished by other designs.'" *Am. Beverage Corp.*, 936 F. Supp. 2d at 588 (quoting *Herbko Int'l, Inc. v. Gemmy Indus. Corp*, 916 F. Supp. 322, 326 (S.D.N.Y. 1996)). The Court may also consider

> whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function.

*Richardson v. Stanley Works, Inc.*, 610 F. Supp. 2d 1046, 1049–50, (D. Ariz. 2009) (quoting *Berry Sterling Corp. v. Pescor Plastics Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997)).

For example, the Federal Circuit distinguished the functional and ornamental aspects of a design patent in *OddzOn Prods, Inc. OddzOn Prods, Inc.*, 122 F.3d at 1405–06. In that case, the design patent encompassed a "rocket-like" football-shaped ball that had a tail and fin structure which added stability for throwing. *Id.* at 1406. Although the Federal Circuit determined the tail and fin structure added to the "rocket-like" appearance of design, it ultimately agreed with the lower court that the tail and fins were functional because they added stability. *Id.* But the Federal Circuit did not invalidate the entire design patent due to functionality. *Id.* Instead, the court held the functional characteristics "limit[ed] the scope of the patent to its overall ornamental visual impression, rather than to the broader general design concept of a rocket-like tossing ball." *Id.* at 1405.

The Federal Circuit employed similar reasoning in *Richardson* when it affirmed how a district court construed a design patent on a multi-function tool. *Richardson*, 597 F.3d at 1294–95. The Federal Circuit found that the design of several elements, including the handle, hammerhead, jaw, and crowbar, were "dictated by their functional purpose." *Id.* at 1294. However, it ruled that the ornamental aspects of those design features were still protected. *Id.* at 1293. Both *Richardson* and *OddzOn* inform the Court that features driven by functionality, not aesthetics, must be excluded from the Court's claim construction of the patented design.

In this case, Plaintiffs ask the Court to adopt the design illustrated in the figures of the Design Patent. (ECF No. 6, p. 51). They also argue that no aspects of the Design Patent should be factored out for functionality because they are all ornamental. (ECF No. 6, pp. 50–52). Plaintiffs add that the non-functionality of the design is "evidenced by the many alternative

design choices available for achieving the 'functions.'"   (*Id.* at p. 52).   While Plaintiffs admit that the Design Patent may contain "some functional elements," such as the Design Patent's elements of "hold[ing] a handbag," they argue those aspects of the Design Patent are also ornamental and therefore properly included in the construed design claim.   (*Id.* at p. 50).

The Design Patent claims "[t]he ornamental design for a handbag hanger hook, as shown and described" in Figures 1–8 of Exhibit 3B.   (ECF No. 2-6, p. 2).   Each of the figures located in the Design Patent are easily discernable.   (*Id.* at p. 2–10).   As such, the Court will not undertake a detailed written description of the claimed design and instead will rely on these figures.

The Court must also identify whether any features are "driven purely by utility" functionality and need to be factored out.   *See Richardson*, 597 F.3d at 1293–94.   This is where *Richardson* and *OddzOn* are instructive.   The functional purpose of the Tote Hanger is for consumers to hang and organize their handbags on closet rods.   (ECF No. 2, pp. 2–3).   The Tote Hanger incorporates two primary utilitarian elements—the top of the hook and the bottom of the hook—to accomplish this purpose.   Anyone seeking to design a handbag hanger hook will incorporate a top hook to attach to a rod-type structure that will support the weight of a handbag. The same is true of the bottom hook, which is needed to hold the handbag in place.   Thus, the Tote Hanger's functional purpose dictates the concept of attaching the two hooks together. Because there is a functional aspect, the concept of two attached hooks must be excluded from the scope of the claimed design.

Additionally, the functional purpose of the Tote Hanger dictates the vertical configuration of the top and bottom hooks due to the necessity of having to place the hook that attaches to a rod-type structure above the bottom hook that holds the handbag.   The vertical configuration of the two hooks supports the weight of a handbag without the top hook slipping from the rod.

Without this configuration, a handbag hook would not be able to support handbags without falling off the rod structure.  If the bottom hook was structured in a different direction, such as 90 degrees from the center of the two hooks, the weight of the handbag would pull the top hook of the rod.   The scope of the claimed design, therefore, also does not include the vertical configuration as utilized in the Tote Hanger.

The Design Patent, however, still protects the ornamental features of the Tote Hanger's top and bottom hooks, which include, among other non-functional features, the shape of the hooks, the flare out of the top hook's tip, the 90-degree offset of the top and bottom hooks, and the spheres on the end of each hook.  None of these specific features affect the functionality of the Tote Hanger.  For example, differently shaped geometrical objects may be placed on each end of the hooks without adversely affecting the Tote Hanger's function.  Plaintiffs' claimed design in those respects has ornamental considerations that do not appear "driven purely by utility."  *Richardson*, 598 F.3d at 1294.  Accordingly, the Court narrows the construction of the Design Patent by filtering out the purely functional elements, the two-hook concept and vertical configuration.

b.  *Infringement*

Plaintiffs claim they are likely to prevail on their patent infringement claim because, under the applicable test, an ordinary observer would be deceived into believing the Accused Product is the same as the Tote Hanger.  (ECF No. 6, p. 52).  The ordinary observer test is the "sole test for determining" whether infringement of a design patent occurred.  *Egyptian Goddess, Inc.*, 543 F.3d at 678.  The test asks

> if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham Mfg. Co. v. White*, 81 U.S. 511, 528 (1871).

Under this test, "infringement will not be found unless the accused article embodies the patented design or any colorable imitation thereof." *Egyptian Goddess, Inc.*, 543 F.3d at 678 (internal quotation marks and citation omitted). An ordinary observer is deceived "[a]s a result of similarities in the overall design, not of similarities in ornamental features considered in isolation." *Amini Innovation Corp.*, 439 F.3d at 1372. A patentee cannot meet its burden if the claimed and accused designs are "plainly dissimilar." *Id.* If the claimed and accused designs "are not plainly dissimilar, resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of the claimed and accused designs with the prior art." *Id.*

The test also provides that the ordinary observer is familiar with prior art. *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010). "When the differences between the claimed and accused designs are viewed in light of the prior art, the attention of the hypothetical ordinary observer may be drawn to those aspects of the claimed design that differ from the prior art." *Id.* "If the claimed design is close to the prior art designs, small differences between the accused design and the claimed design assume more importance to the eye of the hypothetical ordinary observer." *Id.*

AE asserts that the protected design features of the Tote Hanger "are visually distinct and different from the design" features of the Accused Product. (ECF No. 48, p. 2). AE explains the Accused Product lacks a "corkscrew twist in the middle of the hook and [] ball-shaped ends," which exist on Plaintiffs' claimed design. (*Id.* at p. 3). According to AE, these differences take the Accused Product outside the scope of the Design Patent. (*Id.*).

Plaintiffs argue that the Accused Product is "deceptively similar" to their claimed design. (ECF No. 6, p. 52).  Even if functional elements are filtered out and the prior art is considered, Plaintiffs aver an ordinary observer would find the two products have a "strikingly similar overall visual effect that is essentially indistinguishable." (*Id.*).  From their perspective, any element of their claimed design that may be found to be purely functional does not contribute to the overall visual effect of the patented design. (*Id.*).

Even if the claimed design and accused design appear substantially similar, "the patentee must show that the perceived similarity is based on the ornamental features of the design." *OddzOn Prods, Inc.*, 122 F.3d at 1405.  After filtering out the functional elements of the Design Patent and applying the ordinary observer test, the Court disagrees with Plaintiffs that they have shown a likelihood of substantial similarity in the claimed design and the accused design. Instead, a considerable question exists as to whether an ordinary observer would find that the Tote Hanger and Accused Product have a similar overall visual effect.  Accordingly, Plaintiffs have failed to show a reasonable likelihood of success on the infringement issue.

The Court begins its infringement analysis by conducting a side-by-side study of the Design Patent (on the left) and the Accused Product (on the right). *See Crocs, Inc.*, 598 F.3d at 1304.





FIG. 1





FIG. 2



FIG. 5

FIG. 4

(ECF No. 6, p. 21); (ECF No. 48, p. 3).

These side-by-side comparisons of the claimed and accused designs do not suggest to the Court that an ordinary observer would be deceived into believing the accused design is the same as the one claimed by Plaintiffs. The Court acknowledges that the designs have similarities when viewed from a general perspective. But resemblance from this perspective is not enough to prove infringement. *See Ethicon Endo-Surgery*, 796 F.3d at 1336. It is well established that

functional components must be factored out at this general conceptional level. *See id.* When left to compare the remaining ornamental features of the two designs, as a whole, there is a substantial question of whether the claimed and accused designs are plainly dissimilar.

After comparing the overall visual effect of the two products, the most obvious difference lies with the center of each handbag hook. Applying the level of attention an ordinary observer would to these designs, the human eye is immediately drawn to the contrasting corkscrew-like center of the Tote Hanger against the laterally bent center of the Accused Product. Even if the pictures of the Tote Hanger and the Accused Product were mixed randomly, an ordinary observer could quickly restore them to their original order upon viewing the center of the parties' handbag hooks.

Other differences between the two products include the shape of the bottom hook and their finished ends. As to the differences in hook shape, the Tote Hanger's bottom hook is U-shaped and connected to the center of the hook at an approximate 45-degree angle. In contrast, the Accused Product's bottom hook is crescent-shaped and connected to the center of the hook at an approximate 20-to-30-degree angle. The exact degree of the bend is not consequential to the ordinary observer test. Instead, what is critical is that an ordinary observer would notice how the Accused Product's bottom hook is bent in a more open-face manner than the Tote Hanger's.

When it comes to the finished ends of the parties' hanger hooks, the Tote Hanger has sphere-shaped caps compared to the tube-like caps on the Accused Product. Additionally, the top hook of the Tote Hanger flairs at its tip, whereas the Accused Product's tip does not. Considering these dissimilarities, Plaintiffs have not shown that an ordinary observer would be deceived into mistakenly purchasing the Accused Product instead of the Tote Hanger. Although the designs contain other minor ornamental variations, they are not significant enough to change

the overall visual impression of the designs. *See, e.g.*, *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1243 (Fed. Cir. 2009) ("The mandated overall comparison is a comparison taking into account significant differences between the two designs, not minor or trivial differences that necessarily exist between any two designs that are not exact copies of one another."). Accordingly, the Court concludes that Plaintiffs have not shown a likelihood that the accused design is substantially the same as their claimed design.

2. Irreparable Harm

To meet the requirements for irreparable harm, the party seeking relief must establish (1) "that absent an injunction, it will suffer irreparable harm" and (2) "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("*Apple II*") (citations omitted). In doing so, it must also clearly show "a likelihood of substantial and immediate irreparable injury." *Id.* "[C]onclusory statements and theoretical arguments" are not enough to show irreparable harm. *Apple, Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) ("*Apple I*"). Merely showing potential lost sales or some lost market share does not show irreparable harm either. *Id.* at 1324–25; *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).

For the casual nexus prong, the Court must determine to "what extent the harm resulting from selling the accused product can be ascribed to the infringement." *Apple II*, 695 F.3d at 1375. "The causal nexus requirement ensures that an injunction is only entered against a defendant on account of a harm resulting from the defendant's wrongful conduct, not some other reason." *Apple Inc. v. Samsung Electronics Co.*, 809 F.3d 633, 640 (Fed. Cir. 2015) ("*Apple*

*III*").  In all, the Plaintiffs have failed to show that they will be irreparably harmed absent the grant of injunctive relief.

Plaintiffs assert that AE's "competing substandard [i]nfringing [p]roduct" has diminished their profits, brand value, market share, reputation for quality, rapport with current customers, and allurement to new customers.  (ECF No. 6, p. 42).  As a result, Plaintiffs argue they will suffer irreparable harm through AE's alleged infringing activity.  (*Id.* at p. 42).  The Court finds that Plaintiffs have failed to adduce sufficient evidence to demonstrate irreparable harm.

As a threshold matter, Plaintiffs' allegations that AE's infringing conduct harms their profits, consumer relationships, brand value, goodwill, and quality reputation are nothing more than conclusory and theoretical.  (*Id.* at pp. 43–45).  While Plaintiffs offer some case law recognizing this type of harm, they offer no concrete evidence to support their position that they likely will suffer irreparable harm without a preliminary injunction.  *See Apple I*, 678 F.3d at 1325.  For example, Plaintiffs must demonstrate that they have a reputation for quality that could be damaged before asserting AE's alleged infringing conduct will cause them irreparable harm.  Without supportive allegations, the Court cannot agree with Plaintiffs that these alleged harms constitute irreparable harm or that there is a casual nexus between them and the alleged infringement.

Two of Plaintiffs' other arguments rest on the unsupported allegations that AE's product is inferior and that consumers confuse them.  First, Plaintiffs claim that a finding of irreparable harm is supported by the fact that the market for handbag hangers is new.  (ECF No. 6, p. 44).  With AE flooding this new market with inferior products, Plaintiffs assert that consumers will assume all similar products are also of poor quality.  (ECF No. 6, p. 44).  Second, Plaintiffs aver that they "cannot compete" with the loss of pricing power caused by AE's "substandard"

product. (ECF No. 6, p. 44). Although both are valid claims on the surface, the Court cannot find any evidence in the record suggesting that the Accused Product is constructed with sub-quality materials or that consumers confuse them. *See Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 954 (Fed. Cir. 1990) (holding patentee had not shown irreparable harm after failing to provide "objective, empirical information—surveys, interviews, or other material").

For its market loss allegation, Plaintiffs provide nothing more than pure speculation. (ECF No. 6, p. 43) ("Unless the Defendants are enjoined, the Plaintiffs will lose their hard-earned market share, which further supports a finding of irreparable harm."). Under the Federal Circuit's standard, lost market share must be demonstrated. *Apple I*, 678 F.3d at 1324–25. If preliminary injunctions were granted for speculative loss of market share, "every patent case where the patentee practices the invention" would be granted one. *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009) (internal quotations and citation omitted).

As to Plaintiffs' argument that the parties' products compete, the Court does not doubt that AE's offering of the Accused Product could have some impact on the Tote Hanger's sales and profits. (ECF No. 6, pp. 42, 44). Plaintiffs' speculation that AE's alleged infringing conduct will cause Plaintiffs to lose sales is not enough. Federal Circuit precedent is clear that potential lost sales do not demonstrate irreparable harm. *See Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006). Additionally, Plaintiffs have offered no evidence that would show the extent of their competition and allow the Court to make a finding of whether irreparable harm is likely to occur or that monetary damages are inadequate.

The same is true for price erosion. Plaintiffs claim that AE's infringing conduct will lead to price erosion after consumers become accustomed to seeing the Accused Product's lower

advertised prices.  (ECF No. 6, p. 44).  But again, Plaintiffs fail to point to anything more than conclusory statements that this would be likely to occur.  *See Automated Merch. Sys., Inc.*, 357 F. App'x at 301 (rejecting the proposition that conclusory statements can support a finding of irreparable harm caused by price erosion).

Without concrete evidence to support its argument, the Court concludes that Plaintiffs have failed to show irreparable harm.  Accordingly, the Court does not need to consider the second casual nexus prong, given the unsupported allegations of irreparable harm.  Even so, Plaintiffs have failed to provide evidence that would establish a connection between AE's infringement and the purchasing decisions of new and current consumers.  Thus, Plaintiffs have not shown the Court that their claimed injuries rise to the level of irreparable harm.[2]

## IV. CONCLUSION

For the forgoing reasons, the Court finds that Plaintiffs have not met their burden of demonstrating that they are entitled to the extraordinary relief of an injunction.  Plaintiffs' motion as to AE will be denied by Order of Court to follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Date: 1/26/24

---

[2] Having found that Plaintiffs have not established a likelihood of success on the merits and irreparable harm, it is unnecessary for the Court to consider the remaining two factors—the balance of hardships or the public interest.  *See Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 973–74 (Fed. Cir. 1996).  The balance of hardships and public interest factors both weigh in Plaintiffs' favor.  If AE is infringing the Design Patent and Plaintiffs could provide a clear showing of a likelihood of immediate irreparable harm, it would be unfair to allow them to profit from their unlawful conduct.  Similarly, the public is generally served by the enforcement of patent rights.  As such, the last two preliminary injunction factors favor Plaintiffs.  These factors, however, are not sufficient to grant Plaintiffs a preliminary injunction.  Because the Court finds that Plaintiffs have not established both likelihood of success on the merits and irreparable harm, they cannot be granted a preliminary injunction.