IN UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACKI EASLICK, LLC, *et al.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>CJ EMERALD, *et al.*,<br><br>                    Defendants. | Civil Action No. 23-cv-2000<br><br>Judge Stickman |

**SUPPLEMENTAL DECLARATION OF JACKLYN EASLICK
IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
RECONSIDERATION AND DEFAULT JUDGMENT**

I, JACKLYN EASLICK, do hereby declare:

**INTRODUCTION**

1.      I make this declaration in support of Plaintiffs' Motion for Default Judgment [DE 72].  I am providing an opinion on the infringement of US Design Patent No. D695,526 S ("the '526 Patent"), and in particular, on the application of the ordinary observer test.  That is, what impression an ordinary observer would form when purchasing the defendants' products.  I am also providing information regarding the irreparable harm to Plaintiffs caused by any one of the defendants being permitted to sell their infringing products.

2.      There are 10 defendants against whom default judgment is sought.  These 10 defendants have sold Type 1, Type 3, and Type 4 products as noted.  Defendants CJ Emerald, LiteViso, Mzekgxm, and NEZA-US (Type 1).  Defendants Fitnice Official, pengWH Shop, WEIKWGOT-US, and ZGCZZ (Type 3).  HOME DEPUTY and Ume Sports (Type 4).

- 1 -

3. A physical sample of an authentic product is submitted herewith as Physical Exhibit A. Physical samples of Type 1, Type 2, Type 3, and Type 4 products are submitted herewith as Physical Exhibits B (Type 1), C (Type 2), D (Type 3), and E (Type 4).

4. First, I would like to comment on the purported "corkscrew" shape in my design. There is no "corkscrew" shape in my design. The '526 patent describes Fig. 1 as a "perspective view." When viewed from an angle, or perspective, it may appear there is a "corkscrew" shape, but there is not. Below is a picture of one of my TOTE HANGER brand products next to Fig. 1 of the '526 patent and positioned at a similar angle as the product in the figure.



Fig. 1 is viewed at an approximate 45 degree angle, which may create the impression of a slight twist. There is, however, no "corkscrew" shape in the design of my product or in the drawings of the '526 patent. This may be confirmed by viewing Physical Exhibit A submitted herewith. It is also confirmed by all of the other figures in the '526 patent, which do not show a "corkscrew" shape.

**BACKGROUND AND QUALIFICATIONS**

5. I am the owner and managing director of Plaintiff Jacki Easlick, LLC ("JEL"). JEL is the 100% owner of Plaintiff JE Corporate LLC ("JEC") which owns all the intellectual property, including the trademarks and the '526 Patent, the subject of which is the TOTE

HANGER® brand handbag hanger hook. JEL sells the TOTE HANGER® brand handbag hanger hooks. Together, JEL and JEC are the Plaintiffs in this case.

6. I am the named inventor on the '526 patent.

7. Before starting my own companies, I was the Product Development Director for Vera Bradley and ran that company's office and design studio. After a medical emergency that landed me in the ICU, I left Vera Bradley in 2010. Jobless, I began Jackie Easlick, LLC to design and create my own products.

8. From my experience and travels, I realized that consumers like me needed a way to hang and organize their handbags, so I designed and invented the TOTE HANGER® brand handbag hanger hook. Today, Plaintiffs' JACKI EASLICK® brand encompasses many high quality, affordable luxury products, including, but not limited to women's clothing, shoes, handbags, jewelry, and other accessories, such as the TOTE HANGER® brand handbag hanger hook. ("Plaintiffs' Product").

9. Upon advertising the Plaintiffs' Product, knock-offs and infringing versions immediately began appearing and the money spent on advertising was useless as the proliferation of knock-offs prevented Plaintiffs' Product from appearing on the first page of the search results for Amazon.

10. Additionally, because of all the knock-offs online, Plaintiffs were not able to convince retail outlets to stock their authentic product because cheaper versions were available for purchase online.

**INFRINGEMENT ANALYSIS**

11. It is my understanding the test for determining whether a design patent has been infringed is the is the ordinary observer test.  Under this test, "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing . . . purchase [of] one supposing it to be the other, the first one patented is infringed by the other." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 669 (Fed. Cir. 2008)(citation omitted).  I further understand the ordinary observer is presumed to be familiar with the prior art.  *Id.* at 676.

12. I additionally understand infringement is based on a comparison of the accused design to the claim of the design patent, as the claim has been construed.  I also understand the Court has previously construed the claim of '526 patent.  I am not disputing the Court's claim construction.  My analysis is based upon this Court's claim construction.

13. I am providing this declaration to provide additional evidence of how an ordinary observer would compare my design patent to the Type 1, Type 3, and Type 4 products sold by the defaulting defendants.

14. I am a layperson and have no professional degrees in engineering. My training and profession are in fashion and product design.

15. I am familiar with the state of the art before I invented and filed for my design patent. Therefore, I view these accused products, as an ordinary consumer, familiar with the prior art, with my design experience.  The prior art cited in my design patent appears on the face of the '526 patent and is illustrated below.

| The Prior Art and the Patented Design ||||||| 
|---|---|---|---|---|---|---|
| | '924 Design | '446 Design | '278 Design | '092 Design | '438 Design | Patented Design |
| First Side | | | | | | |

16. Before my invention, there was nothing on the market that looked like my invention. None of the prior art was shaped like an 'S' shape, had tips on either end, and had the top and bottom rotated 90 degrees. These major aesthetic features were not offered by any product on the market. I viewed these as design choices and, as an ordinary consumer viewing the product, I believed that these features would be distinct and would draw a consumer's attention to the product.

17. As may be seen from viewing the prior art cited in the '526 patent (discussed above in ¶ 15) and other non-infringing products sold on Amazon (discussed below in ¶ 28), to accomplish the function of my invention, there are a variety of other shapes and configurations that would perform the task of suspending and holding a handbag strap from a closet rod, but I chose the design that included the "S" shape, tips on either end and a 90 degree rotation between the top and bottom.

18. In my view, the feature that a consumer would be most drawn to is the 90 degree bend between the top and bottom. Though the bulbous ends and flared hooks are also features, they are minor when compared to the 90 degree bend between the top and bottom. It is the 90 degree bend that an ordinary consumer would focus on. The 90 degree bend is also the most

distinguishing feature between the patented design and the prior art. Thus, an ordinary observer who is familiar with the prior art would consider the Type 1, Type 2, Type 3, and Type 4 products to be substantially the same as the patented design. The minor features such as the bulb at the end of the hook and the flare at the end of the top hook do not change the substantial similarities in the overall appearance between these designs in the eye of an ordinary observer. The overall appearance in the eye of the ordinary observer is dominated by the similarities in shape of the hooks and the 90 degree rotation between the top and bottom of the hooks.

19.     Also, although the hooks in the design have a function, the hook shapes are not functional because you can accomplish the task of attaching to a closet rod and suspending a handbag strap without copying the hook shape in the patented design. The shape of the hook is not dictated by function because there are other products on the market that are shaped differently and accomplish the same function. Thus, the shape of the patented design is simply not necessary for the design to function to suspend a handbag from a closet rod.

20.     As I previously declared, I viewed each of the defaulting defendants' products that were purchased and received before the lawsuit papers were filed. The products were classified as Type 1, Type 2, Type 3, and Type 4. All looked like my original invention and were thus included in the lawsuit papers.

21.     The Type 1 products were purchased and examined and looked like the TOTE HANGER® . The Type 1 product has the design of the 'S' shape, it has tips on either end, and the top and bottom are rotated 90 degrees – just like my TOTE HANGER® invention. Looking at this product, as an ordinary consumer familiar with the prior art, I do not see distinguishing differences between the Type 1 Product and my invention, as shown below. As you can see from the front view below, there is no "corkscrew". The slight twist is only slightly visible when

the patented product is viewed at a 45 degree angle as shown in Fig. 1 of the '526 patent (and as discussed above). Since no other views of the patented product show this slight twist, an ordinary observer familiar with the prior art would not focus on this feature to distinguish the designs as different. Rather, an ordinary observer familiar with the prior art would focus more on the 90 degree rotation of the generally 'S' shaped hooks and consider the patented design and the Type 1 product design to be substantially the same.

| The Design Claimed in the '526 Patent and Defendants' Infringing Product Type 1 | | |
|---|---|---|
| | Patented Design | Infringing Product Type 1 |
| First Side | | |

The above clearly shows there is no "corkscrew" in both the patented design and the Type 1 product.

22. The Type 2 products were purchased and examined and looked like the TOTE HANGER® . The Type 2 product has the design of the 'S' shape, it has tips on either end, and the top and bottom are rotated 90 degrees – just like my TOTE HANGER® invention. Looking at this product, as an ordinary consumer familiar with the prior art, I do not see distinguishing differences between the Type 2 Product and my invention, as shown below. As you can see from the front view below, there is no "corkscrew". The slight twist is only slightly visible when the patented product is viewed at a 45 degree angle as shown in Fig. 1 of the '526 patent (and as

discussed above). Since no other views of the patented product show this slight twist, an ordinary observer familiar with the prior art would not focus on this feature to distinguish the designs as different. Rather, an ordinary observer familiar with the prior art would focus more on the 90 degree rotation of the generally 'S' shaped hooks and consider the patented design and the Type 2 product design to be substantially the same.

| The Design Claimed in the '526 Patent and Defendants' Infringing Product Type 2 |||
|---|---|---|
| | Patented Design | Infringing Product Type 2 |
| First Side | | |

The above clearly shows there is no "corkscrew" in both the patented design and the Type 2 product.

23.     The Type 3 products were purchased and examined and looked like the TOTE HANGER® . The Type 3 product has the 'S' shape, it has tips on either end and the top and bottom are rotated 90 degrees – just like my TOTE HANGER® invention. Looking at this product, as an ordinary consumer familiar with the prior art, I do not see distinguishing differences between the Type 3 Product and my invention, as shown below. As you can see from the front view below, there is no "corkscrew". The slight twist is only slightly visible when the patented product is viewed at a 45 degree angle as shown in Fig. 1 of the '526 patent (and as discussed above). Since no other views of the patented product show this slight twist, an

ordinary observer familiar with the prior art would not focus on this feature to distinguish the designs as different. Rather, an ordinary observer familiar with the prior art would focus more on the 90 degree rotation of the generally 'S' shaped hooks and consider the patented design and the Type 3 product design to be substantially the same.

| The Design Claimed in the '526 Patent and Defendants' Infringing Product Type 3 | | |
|---|---|---|
| | Patented Design | Infringing Product Type 3 |
| Front | | |

The above clearly shows there is no "corkscrew" in both the patented design and the Type 3 product.

24.     The Type 4 products were purchased and examined and looked like the TOTE HANGER®. The Type 4 product has the 'S' shape, it has tips on either end and the top and bottom are rotated 90 degrees – just like my TOTE HANGER® invention. Looking at this product, as an ordinary consumer familiar with the prior art, I do not see distinguishing differences between the Type 4 Product and my invention, as shown below. As you can see from the front view below, there is no "corkscrew" shown. The slight twist is only slightly visible when the patented product is viewed at a 45 degree angle as shown in Fig. 1 of the '526 patent (and as discussed above). Since no other views of the patented product show this slight twist, an ordinary observer familiar with the prior art would not focus on this feature to

- 9 -

distinguish the designs as different. Rather, an ordinary observer familiar with the prior art would focus more on the 90 degree rotation of the generally 'S' shaped hooks and consider the patented design and the Type 4 product design to be substantially the same.

| The Design Claimed in the '526 Patent and Defendants' Infringing Product Type 4 |||
|---|---|---|
| | Patented Design | Infringing Product Type 4 |
| Front | | |

Below is a comparison of the Type 4 product with Figure 1 of the '526 patent, that shows a similar slight twist in the Type 4 product (sold by defaulting defendant Home Deputy).



**THE MARKETPLACE BEHAVIOR**

25. Before Plaintiffs filed their lawsuit, my TOTE HANGER® brand hanger hook did not appear on the first page of the search results for and an Amazon purchaser looking to buy my

- 10 -

advertised product. Instead, the various defendants' products were listed, and Plaintiffs were not able to sell my product on Amazon. Without sales, Plaintiffs did not obtain any ratings or rankings needed to promote their authentic product on Amazon. Without rating or rankings, Plaintiffs' product did not sell on Amazon.

26. After the Court granted the Plaintiffs' Application for a Temporary Restraining Order, Plaintiffs' genuine product appeared on the first page of the Amazon search results and Plaintiffs' product was purchased by consumers looking for Plaintiffs' Product. In fact, the product inventory sold out and had to be re-stocked for the first time ever.  This is further evidence that consumers equate Plaintiffs' product, with my design choices, as equivalent to the defendants' Type 1, Type 2, Type 3, and Type 4 products – the only products having a 90 degree bend.

27. Indeed, based on the Amazon Standard Identification Numbers (ASINs) of which I am aware defaulting defendants sold under, Amazon has advised that defaulting defendant LiteViso (Type 1) has sold at least 32,000 units and defaulting defendant Home Deputy (Type 4) has sold at least 16,000 units.  A unit is a container which holds multiple hooks, so the number of hooks actually sold by each of these defendants is in the hundreds of thousands.

28. There are products on the market that did not copy my design and would not be viewed as the same by an ordinary consumer.  For example, during our investigation, we identified the following:



| | | |
|---|---|---|
| A. | | **GEZIDEA Purse Hanger S Hooks Twisted S Hooks Closet Rod Hooks for Handbags,Bags,Clothes,Pures,Hats,10Pack (Large&90Deg)**<br>Brand: GEZIDEA<br>4.5 ★★★★☆   360 ratings<br>Amazon's Choice in Utility Hooks by GEZIDEA<br>50+ bought in past month<br>**$12⁹⁹**<br>✓prime One-Day<br>FREE Returns<br>**Coupon:** ☐ Apply 5% coupon  Shop items  |  Terms<br>Thank you for being a Prime member. Get $100 off: Pay **$0.00** $12.99 upon approval for Prime Visa. |
| B. | | **Yzerel 12Pcs S Hooks Hanging Safety Buckle - 3.5 inch Heavy Duty S Hooks,Hanging Plants for Closet Hooks, Clothes, Kitchen Utensil, Pots and Pans, Bags (Black)**<br>Brand: Yzerel<br>4.7 ★★★★☆   601 ratings<br>3K+ bought in past month<br>**-40%** **$5⁹⁹** ($0.50 / Fl Oz)<br>List Price: $9.99<br>✓prime Two-Day<br>FREE Returns<br>Thank you for being a Prime member. Get $100 off: Pay **$0.00** $5.99 upon approval for Prime Visa. |
| C. | | **Maitys 18 Pcs Purse Hanger Hook Acrylic Bag Hanger Handbag Tote Bag Rack Holder Closet Organizer Storage for Backpacks Tote Holder Over The Closet Rod Hanger for Storing Handbags Satchels (Gray)**<br>Brand: Maitys<br>4.1 ★★★★☆   17 ratings<br>**$29⁹⁹** ($1.67 / Count)<br>✓prime Two-Day<br>FREE Returns<br>Thank you for being a Prime member. Get $100 off: Pay **$0.00** $29.99 upon approval for Prime Visa. |



29. The products in the above-paragraph do not look like my invention.

**IRREPARABLE HARM**

30. The irreparable harm to Plaintiffs was addressed in my prior Declaration. [ECF No. 8] I will now expand on the irreparable harm caused to Plaintiffs by any one of the defendants selling their infringing products on an online marketplace.

31. At a high level, the irreparable harm includes the following: (1) not getting into brick and mortar retailers, (2) not getting the market share Plaintiffs should be getting, and (3) losing control of the brand and quality because consumers are buying the infringing products thinking that they are my patented product and being disappointed by the performance of the infringing products.

32. Plaintiffs and their authorized distributors expend significant monetary resources on Internet marketing, including search engine optimization ("SEO") strategies. Other costs include print catalog ads, tradeshows, and handing out free samples. Those strategies allow Plaintiffs and their authorized retailers to fairly and legitimately educate consumers about the value associated with Plaintiffs' brand and the goods sold thereunder. The success of the Plaintiffs' Product is due in part to Plaintiffs' marketing and promotional efforts. These efforts include advertising and promotion through television, retailer websites, including Etsy and Wayfair, and other internet-based advertising, print, participation in trade shows, among other efforts, including in Pennsylvania in The Container Stores and on Lowes.com. Plaintiffs' Product has been featured on *Get Organized* with *Home Edit* on Netflix, websites, social media, and various point-of-sale materials. Similarly, Defendants' individual seller's stores are indexed on search engines and compete directly with Plaintiffs for space in the search results.

33. Additionally, because of all the knock-offs online, Plaintiffs were not able to convince retail outlets to stock their authentic product because cheaper versions were available for purchase online. An example of this is Plaintiffs interaction with Lowes, the home improvement store. The on-ramp to selling in Lowes' physical stores is through its website, lowes.com. Plaintiffs' product is sold through lowes.com, as shown below.



Plaintiffs and I have been told by Lowes personnel that given infringing products are available online, for example products sold by defendants on the Amazon marketplace, Lowes will not be moving my TOTE HANGER brand product into its physical stores at this time. It is impossible to quantify the market share as well as the revenue Plaintiffs have lost – and will continue to lose – from being in Lowes' physical stores if any defendant is permitted to continue to sell infringing products.

34. Plaintiffs' online experience is similar. When a defendant offers an infringing product for sale on an online marketplace such as Amazon, when we advertise our authentic TOTE HANGER brand product, we are essentially driving business to the defendant infringers.

For example, prior to this lawsuit when a consumer would search for "tote hanger" on Amazon our authentic TOTE HANGER brand product would not even appear on the first page of the search results given the number of listings by the defendants for infringing products. Moreover, even when our authentic TOTE HANGER brand product appears next to a listing for an infringing product, the infringing product has a lower price, and more as such may be ranked higher than our authentic TOTE HANGER brand product. For example, below is a listing for an infringing product that is labelled as "Overall Pick."



Thus, defendants' mere presence on an online marketplace irreparably harms Plaintiffs as any advertising Plaintiffs do merely benefits the sellers of infringing products.

35.     Additionally, whether in the brick and mortar retail market or the online market, because of the existence of defendants, Plaintiffs are not being viewed at the market leader for purse hangers, which is causing irreparable harm to both my reputation and Plaintiffs' reputation.

36. Attached as Exhibit F is a copy of an article from CNBC.com entitled "How Amazon counterfeits put this man's business on the brink of collapse." (https://www.cnbc.com/2016/10/24/how-amazon-counterfeits-put-this-mans-business-on-brink-of-collapse.html, last visited Feb. 9, 2024.)  As this article notes, "When 'Good Morning America' viewers go online to buy a set … odds are they'll be purchasing someone else's products."  "It just keeps funneling business to the knockoffs … [i]t's almost like winning the lottery if they choose our item."  The article continues, "Retailers stopped placing orders because they were finding what appeared to be the same thing online for much cheaper."

37. It is my understanding that defendants generally say there is no harm because they've only sold a few units.  But it isn't the sales themselves that cause the greatest harm – it's the defendants offering the infringing product for sale that causes the larger harm.  I understand that offering an infringing product for sale itself is a violation of the patent law.  35 USC 271(a).

38. The infringements of Plaintiffs' Patent deprive Plaintiffs of the ability to control the creative content protected by the Patent Act, it devalues the Plaintiffs' brand by associating it with inferior quality goods, and it undermines the value of the Plaintiffs' IP by creating the impression that infringement may be undertaken with impunity which threatens Plaintiffs' ability to attract investors and markets for the Plaintiffs' Products.

39. The United States government has recognized the harm that online infringers cause to U.S. small business as follows:

Counterfeit goods also damage the value of legitimate brands. When brand owners lose the ability to collect a price premium for branded goods, it leads to diminished innovation as brand owners are less likely to invest in creating innovative products. Legitimate companies, and particularly small businesses, report devastating impacts due to the abundance of competing online counterfeits and pirated goods. Moreover, while e-commerce platforms can benefit legitimate businesses by helping them to reach customers with a new product, the same process and technology also makes it easier for unscrupulous firms to identify popular new products, produce infringing versions of them, and sell these illicit goods to the business's potential customers.

As previously noted, the speed at which counterfeiters can steal intellectual property through e-commerce can be very rapid. If a new product is a success, counterfeiters may attempt to immediately outcompete the original seller with lower-cost counterfeit versions — while avoiding research and development costs. The result: counterfeiters may have a significant competitive advantage in a very short period of time over those who sell trusted brands.

Such fast-track counterfeiting poses unique and serious problems for small businesses, which do not have the same financial resources as major brands to protect their intellectual property. Lacking the ability to invest in brand-protection activities, such as continually monitoring e-commerce platforms to identify illicit goods, perform test buys, and send takedown notices to the platforms, smaller businesses are more likely to experience revenue losses as customers purchase counterfeit versions of the branded products.

In many cases, American enterprises have little recourse aside from initiating legal action against a particular vendor. Such legal action can be extremely difficult. Many e-commerce sellers of infringing products are located outside the jurisdiction of the United States, often in China; existing laws and regulations largely shield foreign counterfeiters from any accountability.

<u>Combatting Trafficking in Counterfeit and Pirated Goods</u>, Report to the President, January 24, 2020 (Ex. 3 to Ference Dec., ECF No. 9)

40. Defendants' actions have caused and will continue to cause, in the event the requested relief is not granted, irreparable harm to Plaintiffs' goodwill and reputation as well as to the unassuming consumers who will continue to believe that the Defendants' cheaply produced, inferior, and typically faulty infringing products and knock-offs are produced, authorized, approved, endorsed, or licensed by Plaintiffs, when they are not.

**CONCLUSION**

41.     In short, none of the defendants selling Types 1- 4 were authorized or licensed to sell the infringing products and they did not have to choose the substantially similar designs in order to offer a hand bag hanger to purchasers on the Amazon online marketplace and based upon my view as an ordinary consumer, familiar with the prior art, and my design experience, each of the Types 1 -4 infringe on the patented design.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 13, 2024
       Rye, New York


                                    /s/Jacklyn Easlick
                                    **JACKLYN EASLICK**